LAWRENCE *v.* WASHINGTON-DETROIT THEATRE CO.

1. CONTRACTS—CORPORATIONS.

An employee of defendant corporation, having charge of hiring theatrical talent, approached plaintiff and proposed that he accept the office of manager of defendant's theatre. He proposed a three-year contract, but the defendant's board of directors declined to bind the corporation for more than a year and a contract was authorized at $100 per week. Two of the directors informed him that the board voted to employ him on the terms which he proposed. He took charge of the theatre and drew a salary of $100 a week, but, the season proving unprofitable, one of the directors broached the subject of a reduction, and, after some negotiations, plaintiff offered to remain on the terms set forth in a blank form of contract, introduced in evidence. He was advised by two members of the board, at a later time, that it had authorized the entering into a contract according to the terms contained in the printed form. It was recorded in the minutes of the board meeting that plaintiff be engaged at a salary of $50 a week, "and a percentage of the net profits to be determined," plaintiff to be subject to the orders of the board. No reference to the printed contract appeared in the record. And one of the members of the board assured the others that plaintiff would resign on two weeks' notice. No writing

was ever executed and plaintiff was merely assured over
the telephone that the board of directors had authorized
the execution of a contract according to the form referred
to, but that it must be brought before the board for exe-
cution. Without further steps towards the completion of
any written instrument he received the decreased salary
and later was discharged on two weeks' notice because of
friction between him and other officials over whom he
claimed to exercise authority. *Held*, that the form of con-
tract proposed by plaintiff was not adopted or ratified by
the board or officers of the defendant corporation and
that the minds of the parties did not meet.

2. SAME—AUTHORITY TO CONTRACT—BOARD OF DIRECTORS.
   Individual members of the corporate board of directors
   or officers of the company cannot bind it by any unau-
   thorized agreement. The board of directors, not the stock-
   holders, president or other officers, is the original supreme
   power in corporations to enter into contracts.

3. SAME—RATIFICATION.
   And mere knowledge of the facts, or unauthorized assur-
   ances by individual members or officers, does not operate
   to bind the corporation notwithstanding affirmative action
   of the board, by resolution, to the contrary.

Error to Wayne; Wiest, J., presiding. Submitted
October 13, 1915. (Docket No. 63.) Decided January
3, 1916.

Assumpsit by Walter N. Lawrence against the
Washington-Detroit Theatre Company for damages for
the breach of a contract of hiring. Judgment for de-
fendant on a verdict directed by the court. Plaintiff
brings error. Affirmed.

*Robert M. Brownson* and *Roy Herald*, for appellant.

*Stellwagen & MacKay* (*James O. Murfin*, of coun-
sel), for appellee.

STEERE, J. Defendant is a domestic corporation
owning and operating a theatre in the city of Detroit.

Plaintiff was in its employ as theatrical manager during part of the summer and fall of 1913. He was relieved from such employment in November, 1913, against his will, and, as he claims, in violation of the contract under which he was employed. This action was brought to recover damages for defendant's breach of his contract of hiring in prematurely discharging him.

After the parties had introduced their testimony and rested, the trial court withdrew the case from consideration by the jury, and granted defendant's motion for a directed verdict in its favor on the ground that plaintiff's testimony, considered in its most favorable light, failed to establish *prima facie* that the contract set out in his declaration and relied upon for recovery was ever agreed upon or entered into between the parties.

Counsel for plaintiff say in their brief:

"The disputed fact in the case, which should have been submitted to the jury under proper instructions, is: 'Is or is not Exhibit 1 the contract which was entered into between the plaintiff and defendant?'"

Counsel for defendant say in their brief:

"There is but one question presented for consideration: 'Did the plaintiff prove with the corporate defendant the contract he sued upon?'"

Exhibit 1, set out at length in plaintiff's declaration, is preceded by the allegation that the parties entered into an agreement on September 29, 1913, "the terms, conditions, covenants and grounds stipulated in said contract to be kept and performed by said plaintiff and the said defendant being in words and figures as follows, to wit." This document was concededly never signed or executed by the parties. It was introduced in evidence, and, as printed in the record, is a blank form of contract, with spaces left for the date, witnesses, signature, and seal of a corpora-

tion and signatures of its vice president and secretary, by whom it was apparently designed to be executed. It is a somewhat formal document, in legal phraseology, with explanatory recitals and paragraphed provisions stating in detail the respective undertakings and obligations of the contracting parties. Stated in outline its import is that the Washington-Detroit Theatre Company, as party of the first part, and Walter N. Lawrence, as party of the second part, contract and agree each with the other that the theatre company employ Lawrence as manager of its theatre for the term of one year from and after the 29th of September, 1913, at a salary of $50 per week, and in addition thereto 10 per cent. of its net profits up to $25,-000, with 5 per cent. of the net profits in excess of $25,000, he to have full authority as manager of said theatre, with power to decide what plays shall be produced, and control over the house employees and players, as well as full power and authority over William Morris, the booking representative of the theatre company, in the direction of what productions shall be given, Lawrence on his part obligating himself to devote his full time and ability to managing the theatre and promoting the interests of his employer, with whose board of directors he is to confer weekly, and, together with them, discuss and determine "the policy of the house."

Plaintiff, the only witness sworn in support of his claim, testified in part that he was by profession a "theatrical producing manager" of large experience in New York theatres, running through many years, and that he went from New York, where he was previously located, to Detroit, with a Mr. Hackett, also a theatrical producing manager, by whom he was employed to assist at the opening of defendant's theatre, and at the request of Mr. William Morris, defendant's New York booking agent, who had first engaged Mr.

Hackett, he "looked after the front of the house" during the opening events, he being the person in attendance most familiar with the proper operation of the theatre; that while he was yet in Detroit Morris asked him, at the request of one of defendant's directors, if he would entertain a proposition to remain in Detroit as manager of its so-called Washington Theatre; and, desiring to be permanently located, he replied that he would accept a proposition if he could secure a satisfactory three-year contract of employment equal to what he was then earning with Mr. Hackett, which was $110 a week, with 10 per cent. profits of the business, but he was informed that defendant's directors in conference had decided they were unwilling to employ him for longer than one year or to pay a salary of more than $100 a week, and plaintiff finally consented that he would act as manager of the Washington Theatre under a contract of employment for one year at a salary of $100 per week; that defendant's board of directors held a meeting, and he was informed by two of its members they had voted to employ him according to the terms of the contract he had proposed; that he thereupon entered into defendant's employ and took charge as manager of its theatre, continuing to operate it for defendant under such contract for the period of ten weeks, receiving a salary of $100 per week, but the enterprise did not prove profitable, for the reason that William Morris, defendant's New York booking agent, who had a contract with full authority to determine the plays and engage the players, had contracted with high-class artists and stars for considerable periods of time in advance, at high salaries ranging from $1,000 to $1,500 per week, and a member of defendant's board of directors commented to him upon the fact that the theatre was losing money, asking during the discussion if he would submit to a reduction of his salary to $50 per week,

which plaintiff refused to do, and, not caring to be longer associated with such vacillating persons, asked to be relieved in two weeks' time; that he was then asked by certain members of defendant's board of directors, if he thought he could make good provided they gave him a salary of $50 per week and a percentage of the net profits; whereupon plaintiff stated on what terms he would remain, and discussed the matter with Mr. McKay, defendant's vice president, who tried to induce him to modify his proposal, and he finally agreed to accept the terms stated in exhibit 1, which McKay said he would put in "memorandum form," and plaintiff suggested exchange of a letter embodying the facts "if we come to an agreement," but McKay said, "No; if we come to an agreement, I am going to draw you a contract and protect you;" that on the next day McKay sent for him and handed him Exhibit 1, asking if it specified the terms as talked over between them, and, on being assured that it did, said, "Mr. Lawrence, this matter has got to come up before the board of directors to authorize its officers to do anything of that kind;" that on September 27th McKay and another member of the board informed plaintiff they had just come from a meeting of the board where the memorandum of the proposed contract was brought up and the officers were authorized to make the contract; that the vice president then told plaintiff he would send for him as soon as they were ready to sign the agreement, saying:

"I am going to the hospital tomorrow, and when I return I will send for you, and then we will come to an understanding. * * * He asked me to wait until he came back and he would send for me and close the matter up."

In substantiation of the contract as alleged in his declaration plaintiff introduced in evidence the rec-

190 Mich.—4.

ord of a meeting of defendant's board of directors under date of October 2, 1913. The minutes of that meeting disclose a then difference of opinion amongst members of the board as to the advisability of employing plaintiff and an attempt to delay action, but, on assurance of a member named Reid that he would bring to the board plaintiff's resignation to be effective in two weeks from the time when the board determined his services were not entirely satisfactory, the following resolution was adopted:

"That W. N. Lawrence be employed as manager of the Washington Theatre for a period of one year at a salary of fifty dollars per week, and a percentage of the net profits, the percentage to be determined, that said W. N. Lawrence to be at all times under the direction and control of the board of directors, and that all matters relating to the operation of the theatre to be determined by the board, and that Mr. McKay be requested to draw suitable contract."

That Reid had ground for such assurances is indicated by plaintiff's admission on cross-examination that he did tell Mr. Reid on one occasion:

"Any time you personally ask me for my resignation I will give it to you."

Plaintiff further testified that the contract on which he relied, although previously discussed, was "never consummated until the 6th of October," at which time he called up Mr. Reid, who, he states, was very kind to him, and to whom he frequently reported concerning the theatre, and asked him why plaintiff had heard nothing further regarding "this proposed new agreement," whereupon Reid assured him, "as an officer of the corporation," that the board of directors had authorized the officers to make such a contract, and plaintiff's services began under it on September 30th, "according to the memorandum of the proposed agreement submitted to Mr. McKay," after which, on con-

sultation with Mr. Reid, plaintiff remitted from that date on the $100 per week he had previously drawn, and thereafter drew only $50 per week; that some time later plaintiff asked McKay when the contract was to be signed, and he replied that "he had just come back from the hospital; he had so much business to attend to; that he would get the board together and sign it." He also further stated that after October 6th he considered he had under this contract "absolute power that I had not possessed before," which he asserted and exercised according to his best judgment and without interference, so far as he knew, until he learned that Mr. Patch, a theatrical man who held stock in the company and had been elected a director, was engaging actors in New York for the Washington Theatre, which made plaintiff indignant, as his contract gave him the sole right to do so, and he laid the matter before Mr. McKay, who assured him he would see that the contract was carried out to the letter, and said:

"Go back to your Washington Theatre, and until the expiration of your contract kick me out; kick anybody out; no member of the board of directors has any right to come in there if you say 'No.'"

As before noted, plaintiff imputed the financial shortcomings during his management of the theatre to defendant's booking agent, Morris, who, he said, hired expensive actors for long terms. Morris had a written contract with defendant, which was signed, and which plaintiff testified gave Mr. Morris "absolute control and power" as to this particular in which Patch trespassed upon plaintiff's prerogative. Asked if Mr. Morris might, if he wanted to, even sign up somebody for $10,000 a week, plaintiff replied:

"He certainly could, and according to that contract, as I read it, the corporation agreed that, if they didn't take what he wanted, he could enjoin them and make them. I had absolutely nothing to do with it at all."

This most binding written contract, as construed by plaintiff, antedated the oral one upon which he relies. While in passing upon a directed verdict against him his testimony is to be taken as true so far as possible, this feature of it presents a dilemma which suggests a reason why the subsequent proposed contract with him was not executed.

Without going into the details as to closing incidents of plaintiff's employment, it is sufficient to state that increasing friction over his claim of authority in connection with what he regarded as unwarranted interference and attempted dictation by defendant's board and its members culminated during the fore part of November in formal action by the board dispensing with his services after two weeks' previous notice.

Plaintiff's position relative to the contract declared upon is thus stated by his counsel:

"It is a contract authorized by the board, and this memorandum contains the terms of it. It is the contract that was operated under."

While plaintiff testified that members of the board assured him that body had accepted his terms and authorized the contract, the record which he introduces to prove this shows the resolution that he "be employed" did not authorize its executive officers to enter into any such contract as Exhibit 1. If that so-called memorandum was then considered by the board, it was manifestly repudiated and rejected, for it gave plaintiff—

"full power and authority  *  *  *  to decide what plays should be produced at said Washington Theatre, and with full authority over the house employees and players employed in and about said theatre, and their salaries,  *  *  *  full authority to determine what bookings shall be made for said theatre, and  *  *  *  full power and authority over William Morris, the booking representative of said party of the first part, as to what productions shall be given."

It also expressly specified the percentage of profits he was to receive, as before stated; while, to the contrary, the contract authorized by the resolution plaintiff relies upon specifies that the matter of percentage on net profits is "to be determined," and plaintiff is to be at all times subject to the dictation of the board, under its direction and control, "all matters relating to the operation of the theatre to be determined by the board," and no authority is given him over William Morris.

It is elementary that individual members or officers of a corporation cannot bind it by any unauthorized contract they may make in its name.

"All contracts of a corporation are to be made by or under the direction of its board of directors. · The board of directors make corporate contracts by a regular vote of the board.  *  *  *  And in all cases the board of directors, and not the stockholders, nor the president, secretary, treasurer, or other agent, is the original and supreme power in corporations to make corporate contracts." 2 Thompson on Corporations, § 1070.

See, also, *Hallenbeck* v. *Casket Co.*, 117 Mich. 680 (76 N. W. 119).

Plaintiff was distinctly advised by McKay of the application of this fundamental rule to the matter in hand, and admits he knew it was necessary for the board of directors to authorize his contract. He shows that a binding written contract was talked over in their negotiations and contemplated. He suggested an exchange of letters embodying the facts, and McKay insisted that, if an  agreement was reached, it should be put in regular contract form. Matters progressed to where this was tentatively done in the form of Exhibit 1, and plaintiff given a copy, being at the same time expressly advised that such contract was not within the scope of powers possessed by agents or offi-

cers of defendant, but must go before and be authorized by the board of directors before it could be signed and become effectual.   He was wide awake to the importance of this and later insistent upon its being signed.

In directing a verdict for defendant the trial court fully recognized that only plaintiff's testimony could be considered, and clearly pointed out its infirmities in part as follows:

"But the question here is, assuming that he was so assured by the officers of the company, or the treasurer and the vice president, whether such officers could bring into being a contract opposed to the resolution of the board of directors.   Contract means when the minds of the parties meet. ' The plaintiff is one party to this contract and the corporation the other—not the mere officers of the corporation.   The affairs of a corporation are governed by the board of directors. They may delegate authority to bind the corporation. * * * Now, I take it the plaintiff contends that, if the directors authorized the officers to enter into a contract with the plaintiff, and such officers informed the plaintiff that the memoranda contract, as prepared, was the contract between the plaintiff and the company, then the minds of the parties met, and a valid parol contract for a year's services was entered into. That would be true if the resolution offered in evidence by the plaintiff, by the board of directors, did not upon its face limit the power of the officers of the company.   The plaintiff, having been paid up to the time of his discharge, cannot recover upon this issue without first showing a valid contract between himself and the company.   Upon his own testimony was he hired for a year?  He certainly was not employed under his own testimony.   Under the terms of this resolution he was not.   The contract that he insists upon expressly repudiates this resolution; it is in conflict with it.   *   *   *   Here the plaintiff, in order to show a contract, admits that whatever contract he was to have with the company was to be submitted to the board of directors, and when he brings in the minutes of the board of directors he affirmatively

shows that he never entered into any contract such as the board authorized," etc.

The principles of ratification by acquiescence and acceptance of benefits contended for by plaintiff are not applicable to the conditions shown in this case. It is undisputed that plaintiff was in defendant's employ as manager of its theatre from the time it was opened in July until he was released in November, a period of 16 weeks. Until October 6th his recognized and paid salary was $100 per week. He continued in the same service and capacity four weeks longer, and it is unquestioned that his compensation remained the same until his discharge, provided his contract of hiring was not changed. The court stated in his charge as a conceded fact, without it being questioned by counsel, that he had been paid for all services rendered up to the time of his discharge; his only claim being for the balance of the year under a new contract. The fact that under the theory of a new contract he did not weekly draw his full pay under the old, of which fact it is not shown the defendant corporation, as such, was advised, conferred no benefit upon the corporation or disadvantage to him, if his right to the $100 per week was not denied. Mere knowledge or unauthorized assurances on the part of individual members or officers of defendant cannot operate to effect a ratification against affirmative action of the board of directors by resolution to the contrary. During the time plaintiff continued in defendant's employ after October 6th no acquiescing or ratifying conduct of the corporation recognizing a new contract which misled, prejudiced, or damaged him is shown.

The judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.